# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE

|  |  |
|---|---|
| IN RE: ) | |
| ) | |
| A&F ELECTRIC COMPANY, INC. ) | |
| ) | **Case Number: 07-01377** |
| *Debtor* ) | **Chapter 11** |
| ) | **Hon. George C. Paine, II** |
| ) | |

---

## MEMORANDUM
---

This matter is before the court on four matters: (1) final approval of the debtor's conditionally approved Disclosure Statement pursuant to 11 U.S.C. § 1125(f)(3); (2) confirmation of the debtor's plan as amended; (3) the Objection of the Debtor to the Claim of Christopher Anderson; and (4) the Supplemental Objection of the Debtor to the Claim of Christopher Anderson. An evidentiary hearing on all matters was held on July 19, 2007. The court took all matters under advisement, and gave the parties seven (7) days in which to file post-trial briefs, and an additional five (5) days for responses. After reviewing all of the proof at trial and all post-trial filings of the parties, the court hereby APPROVES the Debtor's Disclosure Statement; (2) CONFIRMS the debtor's Chapter 11 Plan as amended herein; (3) DENIES that portion of Mr. Anderson's claim seeking punitive damages, and (4) DENIES the Debtor's Supplemental Objection to Mr. Anderson's claim. The following constitutes the court's findings of fact and conclusions of law.

# I.  OBJECTION TO CLAIM OF CHRISTOPHER ANDERSON

## A.  FACTUAL BACKGROUND OF CLAIM OBJECTION

The issues arising in this bankruptcy are the result of deeply-seated animosity between an employer and employee.  Because a full recitation of the underlying facts is not necessary, the court reiterates the factual findings of the Tennessee Court of Appeals. ***Anderson v. A&F Electric Co., Inc.***, 2006 WL 2105885 (Tenn. Ct. App., July 28, 2006).

Plaintiff, Christopher Anderson (Anderson), is an electrician who began working for A & F Electric Company, Inc. (A & F), in November 1996. In addition to his electrical work, Anderson developed an interest in automobile racing. He drove a race car at the Highland Rim Speedway for three years beginning in 1995 and raced a truck in Nashville on a part time basis beginning in 1998.

Anderson was hired by A & F as an electrician. In 1998, he was promoted to lead man with other electricians working under him. A & F provided him with a work truck, tools and equipment, a cell phone and a credit card for gas and other supplies. Anderson received three raises while working at A & F, and at the time he last worked for that company was making $14.75 per hour plus medical insurance, paid holidays and a paid vacation..

Anderson's work assignments normally came through his supervisor, Danny Spicer. In the fall of 2000, one of the owners of A & F, Terry Atwood (Atwood), came to Anderson and asked if he would be interested in working on a new racing facility being constructed by the race car driver, Bobby Hamilton. The job involved installing the electrical service and lighting in the facility and was estimated to take about three months. Anderson accepted the assignment. Atwood explained to Anderson that Hamilton would be paying him directly at his same hourly rate. Normally, A & F would have charged a customer $40 to $50 per hour for one of their employee's services. By letting Hamilton pay Anderson directly, the cost to Hamilton would be reduced to $14.75 per hour. Atwood made this concession for Hamilton because their sons raced together and the two men were good friends. Atwood obtained the permit for the job and showed Anderson what needed to be done.

According to Atwood, when Anderson went to work at Bobby Hamilton's, it was thought he was leaving to work in the racing business and would not be returning to A & F. According to Anderson, Atwood, at no time, told Anderson that he would not remain an employee at A & F. A & F maintained Anderson's medical insurance coverage during the time he worked on the Hamilton project. Anderson also kept the truck, tools, cell phone and credit card provided by A & F. He obtained materials needed for the job from the A & F shop. During the early weeks of the Hamilton job, Anderson continued to work on other A & F projects. At times, other A & F employees worked under him at the Hamilton facility.

On January 16, 2001, while working in the Hamilton facility, Anderson injured his right knee. He was taken to the emergency room at Skyline Medical Center. Prior to entering the emergency room, he phoned Atwood, explained what had happened and inquired as to whether he needed to report the incident to the workers' compensation carrier. According to Anderson, Atwood responded that he could not turn it in as a workers' compensation claim because his insurance premiums were already too high. Atwood suggested he report the incident to Bobby Hamilton. Anderson made an attempt to do that but was told he did not work for Hamilton. When this information was relayed to Atwood, he suggested Anderson use his regular medical insurance.

After an examination in the emergency room, Anderson was referred to an orthopaedic surgeon, Dr. Robert Fogolin. Anderson had sustained a torn meniscus and a torn medial collateral ligament. On March 14, 2001, Dr. Fogolin performed surgery on the knee and Anderson remained under Dr. Fogolin's care until June 16, 2001. Anderson's medical treatment was paid for through his regular medical insurance coverage.

Shortly after his surgery, Anderson again approached Atwood about reporting the injury as a workers' compensation claim. At the time, Anderson had no income and, while his treatment was being covered by his medical insurance, it only paid 80 percent of the expenses and Anderson was being billed for the remainder. Atwood responded that he was paying $2,200 per week in workers' compensation payments already and could not afford to pay more. Filing an additional claim would increase A & F's workers' compensation insurance premium. According to Anderson, Atwood did not claim that Anderson was not an employee of A & F during this conversation. Atwood testified he told Anderson that he was an employee of Bobby Hamilton at the time he was injured.

Anderson had no income after March 2001. His wife was forced to take a part time job to help with the expenses. A lawsuit was filed by Anderson seeking workers' compensation benefits. An answer to the lawsuit was mailed to Anderson's attorney on June 1, 2001. In the answer, A & F took the position that Anderson was an employee of Bobby Hamilton at the time of his injury. Thereafter, on July 2, 2001, Anderson reported to the A & F shop to return to work. He was informed by Danny Spicer that A & F could not put him back to work until they spoke with their attorney and found out what was going on with Anderson's workers' compensation lawsuit. Atwood confirmed Anderson had reported for work and, in Atwood's words, stated, "we couldn't let him go to work with a lawsuit against us."

According to Anderson and his wife, on Friday, July 6, 2001, Danny Spicer came to the Andersons' residence and retrieved the A & F truck, tools, cell phone and credit card. When Anderson inquired what that meant, Spicer replied, "It basically means you're fired. You don't work here no more." Anderson testified that was the first time he had been informed that he was terminated. Anderson went to the A & F shop and obtained

a separation notice.[1] Mr. Anderson did not return to work at A & F Electric following that incident.

As a result of being terminated, Anderson was able to file for unemployment benefits. His application was initially approved around the first of August 2001. Anderson later received a letter from the State of Tennessee Board of Labor and Workforce Development stating their initial determination had been appealed and there would be a hearing to determine who was responsible for the unemployment insurance premiums. That hearing was held November 28, 2001, following which the Board found that Anderson was an employee of A & F Electric at the time of his termination.

On June 27, 2002, Anderson filed suit against A & F alleging a retaliatory discharge as a result of his filing a complaint for workers' compensation benefits. The case was tried before a jury on June 28-30, 2004. The jury returned a verdict in favor of the plaintiff on the issue of retaliatory discharge and awarded compensatory damages in the amount of $138,955. After subsequent proceedings, Anderson was also awarded $56,780.00 in back pay, $3,516.96 in loss of health insurance premiums and prejudgment interest on the back pay and lost insurance premiums in the amount of $3,014.85.

On December 2, 2004, the trial court entered an Amended Order of Judgment awarding Anderson the relief stated above. On December 20, 2004, A & F filed its motion for a new trial. Anderson also filed a motion for new trial on December 29, 2004, reciting that at conclusion of the proof and prior to the closing argument the trial court ruled that the evidence presented did not rise to the level of either intentional or malicious conduct by A & F and, consequently, the plaintiff's claim for punitive damages was removed from consideration by the jury. The record before us does not contain either the jury charge or the transcript of the proceedings wherein the Court dismissed the claim for punitive damages. The trial court overruled both motions for new trial and this appeal was taken.

On appeal, one of the issues raised by Anderson was the judge's decision to take the punitive damages claim away from the jury. On that issue, the appeals court ruled as follows:

Punitive damages are intended to punish a defendant for wrongful conduct and to deter others from similar conduct in the future. ***Liberty Mutual Insurance Company v. Stevenson***, 212 Tenn. 178, 368 S.W.2d 760 (1963). Recognizing the threat of punitive damages to be an

_____

[1]The notice was dated July 6, 2001, and indicated that Anderson had quit to go to work for one of A & F Electric's customers, Bobby Hamilton. From an examination of that document, it appears someone had originally marked that he had been discharged. That entry was whited out and the box for "quit" was marked.

4-U.S. Bankruptcy Court, M.D. Tenn.

effective means of deterring employers from frustrating the purpose of our workers' compensation laws, the Tennessee Supreme Court has stated, "[w]e therefore hold that in future cases a successful plaintiff in a suit for retaliatory discharge will be permitted to recover punitive damages ... " **Clanton v. Cain-Sloan**, 677 S.W.2d 441, 445 (Tenn.1984). After the **Clanton** decision, the Tennessee Supreme Court, in **Hodges v. S.C. Toof & Co.**, 833 S.W.2d 896, 900-01 (Tenn.1992), held that in order to recover punitive damages, a plaintiff must prove, by clear and convincing evidence, that the defendant acted (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly. The limitations contained in Hodges did not change the Court's stand on the availability of punitive damages in a retaliatory discharge case. Apparently on the theory retaliatory discharge is an intentional tort, the Court later stated, "we have specifically held that punitive damages may be assessed in retaliatory discharge cases to insure that employers comply with the duties imposed upon them by the Tennessee Worker's Compensation Act. **Coffey v. Fayette Tubular Prods**. 929 S.W.2d 326, 328 (Tenn.1996).

In the case now before us, A & F may have had an arguable defense to Anderson's workers' compensation claim. That fact did not justify their terminating him when he filed a complaint in court seeking workers' compensation benefits. When describing why the company did not allow Anderson to return to work on July 2, 2001, one of the owners of A & F, Terry Atwood testified, "we couldn't let him go to work with a lawsuit against us." A reasonable jury may have found this statement as well as other circumstances in the case to amount to clear and convincing evidence that A & F acted intentionally in discharging Anderson because he sought to enforce his rights under the Tennessee Workers' Compensation Act. In view of the policy stated by the Tennessee Supreme Court and the facts of this case, the issue of punitive damages should have been submitted to the jury. We reverse the ruling of the trial court and remand the case for a new trial limited to the issue of punitive damages. **See, Rothstein v. Orange Grove Center, Inc**., 60 S.W.3d 807, 814-15 (Tenn.2001).

The Court of Appeals remanded the matter to the state court to conduct an evidentiary hearing on whether punitive damages should be awarded. Before that hearing could be held, A&F Electric filed the chapter 11 bankruptcy petition. The debtor then objected to the claim of Christopher Anderson because it included punitive damages.[2]

The issue before this court, therefore, is whether Anderson can show, by clear and

---

[2] The actual amount sought in Mr. Anderson's Amended Proof of Claim is $853,895.51.

convincing evidence, his entitlement to punitive damages, and if so, in what amount.[3]

## B. DISCUSSION OF CLAIM OBJECTION

The Supreme Court of Tennessee's decision in ***Hodges v. S.C. Toof & Co.***, 833 S.W.2d 896 (Tenn 1992) is the governing authority regarding punitive damage awards in Tennessee. ***Hodges*** explains that punitive damages must be proven by clear and convincing evidence. ***Id***. at 901. Furthermore, the fact that sufficient evidence exists for a fact-finder to award compensatory damages "does not require a conclusion that the evidence was clear and convincing on the type of conduct necessary to warrant punitive damages." ***Id.***

In modifying the then-existing standard for punitive damages, ***Hodges*** made it clear that punitive damages should be limited to cases involving "only the most egregious of wrongs." ***Id***. at 901. ***Hodges*** further provides that punitive damages should be limited to cases in which a defendant has acted 1) intentionally, 2) fraudulently, 3) maliciously, or 4) recklessly. ***Id.***

At trial, therefore, it was Mr. Anderson's burden to show by clear and convincing evidence, that A&F Electric's conduct was among the "most egregious of wrongs" worthy of punishment. The court read the entire trial transcript in preparation for the hearing. The court found no proof in the trial transcript that supported an award of

---

[3] The debtor has also raised a supplemental objection to Mr. Anderson's claim based upon the post-petition conduct of Mr. Anderson's counsel. The facts relevant to the supplemental objection are included below in the factual summary related to Confirmation issues.

punitive damages.[4] The proof indicated that each side recounted their version of events as honestly as they recalled it. Confusion surrounded who in fact Mr. Anderson worked for at the time of his accident, and even if Mr. Atwood acted incorrectly in how he handled Mr. Anderson's situation, it was not out of spite, maliciousness, reckless or intentional motivation to cause injury to Mr. Anderson. The jury found that A&F Electric was liable for retaliatory discharge and compensated Mr. Anderson by its compensatory damages judgment against A&F Electric.

Subsequently, this court heard no proof to justify an award of punitive damages. Although the court did hear from Mr. Anderson about his financial losses he suffered as a result of the litigation between himself and A&F Electric, that testimony goes only to the compensatory damages that Mr. Anderson has already been awarded. Nothing in the trial transcript or the claims hearing rose to the level of "clear and convincing" for punitive damages in this case.

Accordingly, the court SUSTAINS the debtor's objection to the amount of Mr. Anderson's proof of claim. The court finds Mr. Anderson's claim is allowed in the amount of $247,039.77.

## II.    DISCLOSURE STATEMENT, CONFIRMATION, AND SUPPLEMENTAL CLAIM OBJECTION

---

[4]As recognized by the trial judge, any errors by Debtor do not warrant a punitive damage award under the standard set forth in *Hodges*. In fact, the trial court reached the same conclusion reached by this court on review of the transcript, that there was not even enough evidence to warrant submission of the cause of action to the jury at the time of trial. Even though the Court of Appeals remanded for consideration of punitive damages by the trier of fact, it worth noting that two trial judges have now found that punitive damages are not warranted on the facts in this case.

### A. FACTUAL BACKGROUND RELATING TO FINAL APPROVAL OF THE DISCLOSURE STATEMENT AND CONFIRMATION OF THE DEBTOR'S PLAN, AS AMENDED.

A&F has been in business since 1978. Until 2004, Mr. Atwood had a partner in the business by the name of David Dodd. According to Mr. Atwood's testimony, after the Anderson verdict was rendered, Mr. Dodd wanted to be bought out of the partnership. Mr. Atwood agreed, and the parties executed a "Revised Agreement of Understanding" whereby, among other things, all of Dodd's capital stock was redeemed for $219,369.00, and Dodd was given certain trucks and inventory in exchange for repayment of debts A&F owed to Dodd.

When Dodd left the partnership, Mr. Atwood testified that Dodd took many good employees and customers with him when he opened up a competing business. This began A&F's downward spiral in a very competitive industry.[5] Mr. Atwood testified about the damage to A&F's business, and this testimony was corroborated by Donna Lane, A&F's Controller. In addition to the loss of some customers and employees, Ms. Lane explained that they were constantly concerned that Mr. Anderson would execute upon his judgment. According to Mr. Atwood and Ms. Lane, if Mr. Anderson were to execute on the judgment, it would mean the end of A&F Electric under the tight cash flow situation in which the company was already operating.

In addition to the loss caused by Mr. Dodd's departure and the threat of the Anderson judgment being executed upon, cash-strapped A&F was trying to compete in a very difficult industry. As aptly explained by Ms. Lane, A&F's ability to make its' payroll depended upon being timely paid by contractors, who in turn were dependent

---

[5] Prior to Dodd's departure, A&F had over 100 employees, but as of confirmation employed about 60 people.

upon their customers timely paying them. The ever-changing nature of A&F's jobs, contractors, and accounts receivable made regular cash flow a rarity.

In light of these circumstances, and following the Court of Appeals decision, A&F filed bankruptcy on February 27, 2007. On March 16, 2007, the debtor filed a Disclosure Statement and sought conditional approval of the disclosure statement. A hearing on conditional approval and confirmation of the debtor's proposed plan was scheduled. Chris Anderson filed an objection to both the plan and disclosure statement. The Disclosure Statement was conditionally approved pursuant to 11 U.S.C. § 1125(f)(3). Objections to confirmation and ballots accepting or rejecting the plan were to be filed by April 17, 2007.[6] The debtor received one rejecting ballot (from Anderson) and all other ballots received, accepted the plan.

After some continuances of the confirmation hearing, the final hearing on the Disclosure Statement and on Confirmation was scheduled for July 19, 2007. A few weeks prior to that hearing, counsel for Mr. Anderson sent a letter to other creditors of A&F Electric containing the ballot previously mailed by debtor's counsel but marked "rejected," and "urging" creditors to join Anderson in defeating the debtor's proposed chapter 11 plan.[7] More precisely:

---

[6]The Ballot for Accepting the Debtor's Plan were to be received by debtor's counsel on or before April 17, 2007. The Ballot states:

If your ballot is not received by Debtor's counsel on or before April 17, 2007, and such deadline is not extended, your vote will not count as either an acceptance or rejection of the Plan.

[7]The letter, in Mr. Anderson's view, summarizes the debtor's proposed plan of reorganization and provides what Mr. Anderson considers to be relevant information about A&F. The letter provides, in part:

By now you should have received a copy of the disclosure statement and plan of reorganization filed on behalf of A&F Electric, Company, Inc. The plan of reorganization proposes to pay unsecured

We solicit your support and urge you to complete the enclosed Ballot indicating your rejection of the plan of reorganization filed on behalf of A&F Electric Company, Inc., For your Ballot to be counted, it must be received by the undersigned at the next possible date, and in any event, no later than the close of business on July 18, 2007.

The letter is signed by Joseph P. Rusnack, counsel for Christopher Anderson.

The debtor filed a Supplemental Objection to the claim of Christopher Anderson based upon the misleading nature of the letter and the inappropriate solicitation of ballots after the voting period for acceptance or rejection of the plan had closed. The debtor asks the court to equitably subordinate Mr. Anderson's claim to all other

---

creditors a total of $336,000 over a four year period without interest. The claims of the unsecured creditors, including Mr. Anderson's $853,895.51 claim, total at least $1,605,209.48. If Mr. Anderson's claim is allowed in its entirety, creditors can expect to receive no more than 21 cents on the dollar spread out over 4 years. We firmly believe that A&F Electric Company, Inc. can afford to pay unsecured creditors more than 21 cents on the dollar. We contend that the plan of reorganization should not be approved by the Bankruptcy Court. Please consider the following information supplied to us by A&F Electric Company, Inc.:**

1.    In October 2004, A&F Electric, Inc. redeemed 50% of its outstanding stock for an amount in excess of $219,369, but now claims it has zero net worth.

2.    A&F Electric Company, Inc. grossed almost 6.9 Million Dollars in 2006.

3.    A&F Electric Company, Inc. grossed almost 6.2 Million Dollars in 2005.

4.    A&F Electric Company, Inc. grossed almost 6.5 Million Dollars in 2004.

5.    A&F Electric Company, Inc. currently earns more than $37,680 each month in net income.

6.    Under the plan of reorganization, the President and sole shareholder of A&F Electric Company, Inc., Mr. Terry Atwood, will continue to receive a salary of $4,000 per week.

**Footnote in letter states:
All of the information contained herein is qualified by the information contained in the disclosure statement and plan of reorganization filed on behalf of A&F Electric Company, Inc. Creditors are urged to study the disclosure statement and plan of reorganization carefully. Most of the information contained in this letter comes from the Debtor's plan of reorganization, the bankruptcy schedules, or Mr. Atwood's own testimony at the meeting of creditors on March 30, 2007.

unsecured claims. According to the debtor, the letter was motivated by ill-will rather than pursuit of a fair confirmation process, damaged the debtor's continuing business, and caused confusion among the creditors.

Before the July 19, 2007 confirmation hearing, Chris Anderson filed objections to the conditionally approved disclosure statement and plan. Anderson objected that the disclosure statement did not provide "adequate information," containing only conclusory statements. The specific objections relating to "adequate information" were that the plan violated the "absolute priority rule;" no information was given regarding the identity of any insider that will be employed or retained or what their compensation would be; and, no information was provided about Terry Atwood's proposed salary and benefits. No other party, including the United States Trustee, objected to the conditionally approved Disclosure Statement.

Anderson also filed an objection to the debtor's chapter 11 plan. The objections were as follows:

> 1. The requirements of Bankruptcy Code section 1129(a)(1) and, by reference, Bankruptcy Code section 1123(a)(5) have not been met and the Plan does not provide adequate means for its implementation.
>
> 2. Upon information and belief, the requirements of Bankruptcy Code section 1129(a)(7)(A) have not been met in that the Plan may not have been accepted by each holder of a claim in each class designated under the Plan and such claimants may not be receiving or retaining property of value, as of the effective date of the Plan, that is not less than the amount such claimants would receive or retain if the Debtor were liquidated under Chapter 7.
>
> 3. The requirements of Bankruptcy Code section 1129(a)(11) have not been met in that it appears likely that confirmation of the Plan will be followed by the liquidation or the need for further financial reorganization of the Debtor.
>
> 4. The requirements of Bankruptcy Code section 1129(b)(2)(B) have not been met in that Debtor's equity security holders will retain their stock in the Debtor prior to the payment in full of the claims of unsecured creditors.

The debtor filed an amended plan after Mr. Anderson's objection. The amended plan

provides that unsecured creditors will receive 35% of their allowed secured claims with payments commencing on the first day of the month after the plan's effective date for 48 months. The amended plan also requires Mr. Atwood to pay $100,000 to A&F Electric on or before the effective date of the plan in exchange for retaining his interests in the debtor.

In addition to those amendments, Mr. Atwood testified at the confirmation hearing that he would make additional plan amendments reducing his salary from $4,000 weekly to $2,000 weekly during the repayment period of the plan, and not take his salary, if necessary, in order to make plan payments.[8]

## B.    FINAL APPROVAL OF DISCLOSURE STATEMENT

Section 1125(f)(3) provides:

(f) Notwithstanding subsection (b), in a small business case--
(1) the court may determine that the plan itself provides adequate information and that a separate disclosure statement is not necessary;

(2) the court may approve a disclosure statement submitted on standard forms approved by the court or adopted under section 2075 of title 28; and

(3)     (A) the court may conditionally approve a disclosure statement subject to final approval after notice and a hearing;

(B) acceptances and rejections of a plan may be solicited based on a conditionally approved disclosure statement if the debtor provides adequate information to each holder of a claim or interest that is solicited, but a conditionally approved disclosure statement shall be mailed not later than 25 days before the date of the hearing on confirmation of the plan; and

---

[8]These amendments have not yet been filed with the court, but the court's decision herein, confirms the plan subject to those amendments being part of the confirmed plan.

12-U.S. Bankruptcy Court, M.D. Tenn.

(C) the hearing on the disclosure statement may be combined with the hearing on confirmation of a plan.

11 U.S.C. § 1125 (2007). Thus, for a small business debtor, the court may conditionally approve a disclosure statement subject to final approval after notice and a hearing. The conditionally-approved disclosure statement may be used to solicit creditor votes on the debtor's plan. Finally, the hearing on final approval of the disclosure statement may be combined with the hearing on confirmation of the plan. 11 U.S.C. § 1125(f)(3). That is precisely what occurred in this case.

The court, may therefore, accept the ballots as cast according to the debtor's voting tabulation, if the disclosure statement contains "adequate information" as defined by section 1125(a)(1) as follows:

(a) In this section--

(1) "adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information;

11 U.S.C. § 1125(a)(1) (2007).

The purpose of the disclosure provisions of Chapter 11 is to provide holders of claims and interests with "adequate information" prior to the acceptance or rejection of a reorganization plan, in order for them to be able to make an informed judgment as to

13-U.S. Bankruptcy Court, M.D. Tenn.

the feasibility of the plan. ***In re Microwave Prods. of America, Inc.***, 100 B.R. 376, 377 (Bankr. W.D. Tenn. 1989). Section 1125 of the Code permits the Court to construe the adequacy of disclosure statements on a case by case basis. ***Id.; In re A.C. Williams Co.***, 25 B.R. 173 (Bankr. N.D. Ohio 1982).

Numerous courts have prescribed a list of disclosures which typically should be included in a disclosure statement. The court in ***Microwave Prods.*** listed non-exclusive, factors to be used as a guide or yardstick to aid courts in determining adequacy in each case:

1. The circumstances that gave rise to the filing of the bankruptcy petition;

2. A complete description of the available assets and their value;

3. The anticipated future of the debtor;

4. The source of the information provided in the disclosure statement;

5. A disclaimer, which typically indicates that no statements or information concerning the debtor or its assets or securities are authorized, other than those set forth in the disclosure statement;

6. The condition and performance of the debtor while in Chapter 11;

7. Information regarding claims against the estate;

8. A liquidation analysis setting forth the estimated return that creditors would receive under Chapter 7;

9. The accounting and valuation methods used to produce the financial information in the disclosure statement;

10. Information regarding the future management of the debtor, including the amount of compensation to be paid to any insiders, directors, and/or officers of the debtor;

11. A summary of the plan of reorganization;

12. An estimate of all administrative expenses, including attorneys' fees and accountants' fees;

13. The collectibility of any accounts receivable;

14. Any financial information, valuations or pro forma projections that would

be relevant to creditors' determinations of whether to accept or reject the plan;

15. Information relevant to the risks being taken by the creditors and interest holders;

16. The actual or projected value that can be obtained from avoidable transfers;

17. The existence, likelihood and possible success of non-bankruptcy litigation;

18. The tax consequences of the plan; and

19. The relationship of the debtor with affiliates.

100 B.R. 376, 378-79. (Bankr. W.D. Tenn. 1989).

Anderson's objections relate to the "absolute priority rule;" information about insiders, and compensation paid to Mr. Atwood upon confirmation. The court finds that on the whole, the disclosure statement does provide "adequate information" for a party in interest to make a decision whether to accept or reject a plan. Specific information about Mr. Atwood's $100,000.00 contribution to A&F Electric in the plan amendment dispel any absolute priority rule disclosure concerns.

The court agrees with Mr. Anderson that the disclosure statement most likely should have contained Mr. Atwood's salary information. However, the absence of that information did not bring objections by any other creditor or the United States Trustee, only Mr. Anderson who is engaged in a battle with A&F over his claim. Furthermore, thanks to counsel for Mr. Anderson's letter, the creditors were informed of Mr. Atwood's salary, but such information did not result in a wave of (late-filed) ballots rejecting the plan. Finally, Mr. Atwood's agreement to reduce his salary to $2,000 per week during the plan repayment period will be noticed to all parties by the order confirming the chapter 11 plan.

The court, therefore OVERRULES all objections to the adequacy of the disclosure statement. At this final hearing on adequacy of the conditionally approved disclosure statement, the court hereby APPROVES the debtor's disclosure statement.

## C.   CONFIRMATION

Mr. Anderson's objects to confirmation because he suggests the debtor's amended plan does not provide for adequate means of implementation (11 U.S.C.§ 1129(a)(1) and 1125(a)(3)); does not pass the "best interest of creditors" test (11 U.S.C. § 1129(a)(7)); is not feasible (11 U.S.C. § 1129(a)(11)); and (4) violates the absolute priority rule (11 U.S.C. § 1129(b)(2)(B)).

### 1. 11 U.S.C. § 1129(a)(1)

Section 1129(a)(1) requires a plan to comply with all applicable provisions of the Code. Mr. Anderson contends that the debtor's amended plan fails to comply with 11 U.S.C. § 1123(a)(5) which requires a plan to provide an "adequate means of implementation." Generally, this is a requirement that the debtor must provide some method for repayment of debts.

According to the largely uncontradicted testimony of the debtor's president, Terry Atwood, and the debtor's controller, Donna Lane, the debtor's plan provides a realistic and likely method to repay the debtor's creditors. Ms. Lane testified that she thought the debtor's pro forma budget attached to the plan was achievable and that all of the goals of the chapter 11 plan were attainable.

Mr. Anderson argues that the projections in the debtor's budget differ from the actual numbers listed in the debtor's Statements and Schedules. According to Mr.

Anderson, only a few months time separated preparation of the Statements and Schedules and the pro forma budget attached to the plan, and the difference between the figures is unreasonable. Ms. Lane's testimony as to the difference between the schedules and the budget were both reasonable and credible. The court found no evidence offered by Mr. Anderson that rebutted the debtor's proof demonstrating not only the implementation but also the feasability of the amended plan.

Accordingly, the court OVERRULES Mr. Anderson's objection to confirmation based upon 11 U.S.C. §§ 1129(a)(1) and 1123)(a)(5).

### 2. 11 U.S.C. § 1129(a)(7)

Under the best interests of creditors test, a plan may not be confirmed unless all impaired creditors either accept the plan or "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." **11 U.S.C. § 1129(a)(7)(A).** As one commentator explains, "[t]his means that, absent consent, a creditor ... must receive property that has a present value equal to that participant's hypothetical chapter 7 distribution if the debtor were liquidated instead of reorganized on the plan's effective date." 7 Alan N. Resnick, et al., COLLIER ON BANKRUPTCY ¶ 1129.03[7][b] (15th ed. 2004) (emphasis added). This provision provides an individual guaranty to each creditor or interest holder that it will receive, as of the effective date of the plan, at least as much in reorganization as it would in liquidation. **Id.** at ¶ 1129.03[7].

The debtor's proof on this issue was convincing. At numerous times throughout the testimony of Ms. Lane and Mr. Atwood, it was made clear that if the debtor's assets were liquidated, very little, if any would be available to pay creditors. The payments to

creditors in this case is completely dependent upon A&F Electric as a going concern. The actual assets in the possession of the company at a sale would bring far less than the creditors are to be paid under the amended plan. According to Ms. Lane and Mr. Atwood's testimony, current accounts receivable of the debtor approximate $750,000.00. Of that amount, if the company assets were sold in a liquidation scenario, the probability of collecting those amounts are as follows:

| Accounts Receivable | Amount | Collectible on Immediate Liquidation |
|---|---|---|
| Commercial AR | $450,000 | Very little |
| Residential AR | $187,500 | Maybe $40,000 |
| Service AR | $112,500 | Maybe 75% |

In addition, Ms. Lane testified that the actual hard assets of the company, including vehicles, tools, and equipment were either highly leveraged or would bring very little in a liquidation.

Ms. Lane's testimony on these issues was concise and convincing. The court finds that Mr. Anderson would certainly receive less in a chapter 7 liquidation (as of the effective date of the plan) than he will receive under the debtor's amended plan.

Accordingly, the court OVERRULES Mr. Anderson's objection to confirmation pursuant to 11 U.S.C. § 1129(a)(7).

### 3.    11 U.SC. § 1129(a)(11)

Section 1129(a)(11) requires:

Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed by the plan.

As summarized by this court in *In re American HomePatient, Inc.*, 298 B.R.

152, 169 (Bankr. M.D. Tenn., 2003):

> The test for feasibility entails an examination of several factors: (1) the adequacy of the [debtor's] capital structure; (2) the earning power of the [debtor's] business; (3) economic conditions [that the debtor will face during the plan period]; (4) the ability of [the debtor's present] management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

> The proponent of a plan of reorganization does not need to guarantee success, "but a court cannot confirm a visionary scheme that promises creditors more than the debtor can possibly attain after confirmation, 'notwithstanding the proponent's sincerity, honesty and willingness to make a best efforts attempt to perform according to the terms of the plan.' " *In re Mallard Pond*, 217 B.R. 782, 785 (quoting In re Rack Eng'g Co., 200 B.R. 302, 305); *In re Ridgewood Apartments of DeKalb County*, Ltd., 183 B.R. 784, 789 (Bankr. S.D.Ohio 1995) (does not require proof that meeting economic projections is certain, but financial projections must be based on realistic and reasonable assumptions capable of being met); *In re IPC Atlanta Ltd. P'ship*, 142 B.R. 547, 559-60 (Bankr. N.D.Ga.1992) (Code does not require guarantee of successful reorganization, but the plan must offer a reasonable prospect of success); *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 507-8 (Bankr. S.D.Tex.1989) ("when financial realities do not support the projections or where the proponents' projections are unreasonable, the plan should not be confirmed").

*Id.* at 169 (some internal citations omitted).


The proof offered by the debtor confirms that the debtor's amended plan is no visionary scheme, but is a reasonable prospect of success. In any industry, financial projections are nothing more than that–projections. As the proof demonstrated, there are no guarantees as to future expenses and income in the debtor's difficult industry either. The debtor's business is wholly dependent upon their contractors being paid, who in turn must rely on customers to pay the contractors. For all the reasons that the court found that the plan satisfies the best interest of creditors test and satisfies the requirement that the plan has a reasonable means of implementation, the court finds that the plan is feasible.

Mr. Atwood, and Ms, Lane, in particular, provided detailed explanations of the projections upon which the debtor's plan is relying. Her testimony was thoughtful, truthful and supported by her expertise as a controller in the electric supply business. The court finds the evidence submitted by the debtor demonstrated to the court by more than a preponderance of the evidence that the debtor's proposed plan, as amended, has a reasonable prospect of success. As such, the court OVERRULES Mr. Anderson's objections to confirmation based upon feasability.

### 4.    11 U.S.C. § 1129(b)(2)(B)

Lastly, Mr. Anderson objects to the debtor's amended plan based upon his argument that the plan violates the absolute priority rule of section 1129(b)(2)(B). Section 1129(b) provides that a plan must be "fair and equitable" with respect to each class of impaired claims. Thus, the shareholders of a debtor corporation may not use bankruptcy reorganization to impair the interests of unsecured creditors while preserving their own equity. *Louisville Trust Co. v. Louisville, New Albany, and Chicago Rwy.*, 174 U.S. 674, 689, 19 S.Ct. 827, 43 L.Ed. 1130 (1899). This has become known as the "absolute priority rule," and a modified version of the rule is now codified at 11 U.S.C. § 1129(b)(2)(B)(ii), which provides:

With respect to a class of unsecured claims-

> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

*Bank of America Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle Street Partnership*, 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999). The debtor's amended plan allows Mr. Atwood to retain his interest in the debtor while Mr. Anderson's claim is not paid in full. Mr. Anderson thus contends that the plan violates the absolute priority rule and is unconfirmable.

Mr. Atwood proposes to avoid the effects of the rule by relying on a well-noted exception to it. The "new value" exception provides the absolute priority rule is not a bar to confirmation if the shareholders "contribute new capital in money or money's worth, reasonably equivalent to the property's value, and necessary for successful reorganization of the restructured enterprise." ***Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship***, 526 U.S. 434, 442, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999); ***In re U.S. Truck Co.***, 800 F.2d 581, 588 (6th Cir.1986). Under this exception, equity holders, such as shareholders, may own and control a reorganized business without paying impaired classes in full by exchanging new value to acquire ownership of the reorganized debtor. ***In re Creekside Landing Ltd.***, 140 B.R. 713, 717 (Bankr. M.D.Tenn.1992). In order for this exception to apply, the "new value" must be: (1) necessary or essential to the success of the reorganization, AND (2) reasonably equivalent to the interests retained, "a requirement which the Sixth Circuit characterized as 'substantial.' " ***In re Crosscreek Apartments, Ltd.***, 213 B.R. at 546 (citing ***In re U.S. Truck Co.***, 800 F.2d at 588 (indicating a contribution of new value must be "essential and substantial")).

Under the amended plan, Mr. Atwood proposes to contribute $100,000 to the debtor to help fund the plan. According to Ms. Lane's uncontradicted testimony, the capital is necessary. Ms. Lane testified that A&F has been forced on more than one occasion to borrow funds from Mr. Atwood's brother and son to meet payroll while waiting on a contractor to pay the debtor. Under the plan, payments due on the effective date can be paid with the funds contributed by Mr. Atwood, and the company will have some "cushion" to ensure that payroll can be timely met while waiting on payments from their contractors. The court finds that based upon the proof at trial that the $100,000 from Mr. Atwood meets both the substantial and necessary thresholds to qualify under the new value exception to the absolute priority rule.

The court, therefore, OVERRULES Mr. Anderson's objection to confirmation based upon 11 U.S.C. § 1129(b)(2)(B).

Based on all of the foregoing, the court finds that the debtor's plan as amended and as provided for herein, shall be confirmed. All objections by Mr. Anderson are hereby OVERRULED.

## D. SUPPLEMENTAL CLAIM OBJECTION

The last issue involves the debtor's request to equitably subordinate Mr. Anderson's claim based upon the alleged improprieties of Mr. Anderson's counsel in sending out the June 22, 2007 letter to creditors after the plan voting period had closed. According to the debtor, the letter was generated out of ill-will; contained misleading information; caused confusion and distrust with long-time customers; and may have engendered lasting negative financial consequences for A&F. Mr. Anderson offered no real response to these allegations other than to attempt to show that no customers had been lost as a result of the letter and no actual financial harm resulted.

Section 510(c) of the Bankruptcy Code, which provides:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may-

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest....

11 U.S.C. § 510(c)(1).

The Sixth Circuit has adopted a three-part standard for establishing equitable subordination: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or

conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act. *In re AutoStyle Plastics, Inc.* 269 F.Ed 726 (6th Cir. 2001); *In re Baker & Getty Fin. Servs., Inc.,* 974 F.2d 712, 717-18 (6th Cir.1992) (citing *In re Mobile Steel Co.,* 563 F.2d 692, 699-700 (5th Cir.1977)). Satisfaction of this three-part standard does not mean that a court is required to equitably subordinate a claim, but rather that the court is permitted to take such action. *AutoStyle Plastics*, at 745; *In re Octagon Roofing*, 157 B.R. 852, 857 (N.D.Ill.1993).

The court finds that the debtor's proof did in fact show inequitable conduct. The testimony of at least two of the debtor's vendors confirms that the letter confused them as to whether they had accepted or rejected the debtor's amended plan. The letter may have injured the debtor's good will or injured the debtor financially. Other courts under similar circumstances have subordinated claims based on this type of conduct. *See In re Clamp-All*, 233 B.R. 198 (Bankr. D. Mass. 1999) (creditors claim subordinated to all but insiders where creditor promoted own plan during exclusivity). Despite these findings, the court is not inclined to punish Mr. Anderson by subordinating his claim. Although the court found the letter sent by Mr. Anderson's counsel unsettling and inappropriate, the court does not choose to equitably subordinate Mr. Anderson's claim.

The court, therefore, DENIES the debtor's supplemental objection to Mr. Anderson's claim and DENIES the debtor's motion for equitable subordination of Mr. Anderson's claim.

### III.    SUMMARY AND CONCLUSIONS

Based on all the foregoing, the court SUSTAINS the debtor's objection to Mr. Anderson's claim in any amount alleged above $247,039.77. The court APPROVES

the debtor's conditionally approved Disclosure Statement.  In addition, the court orders that the debtor's proposed chapter 11 plan, as amended and as provided herein, is CONFIRMED.  Finally, the court DENIES the debtor's supplemental objection to Mr. Anderson's claim and DENIES the debtor's motion to equitably subordinate Mr. Anderson's claim.

The court instructs counsel for the debtor, within five (5) days of entry of this Memorandum, to prepare an order not inconsistent with the court's findings herein.

It is, THEREFORE, so ordered.
This _____ day of August, 2007.

***THIS MEMORANDUM  WAS SIGNED AND
ENTERED ELECTRONICALLY  AS INDICATED
AT THE TOP OF THE FIRST PAGE.***